CITY OF NEWARK, PETITIONER, v. NEWARK AND ESSEX
BUILDING CORPORATION, RESPONDENT.

Decided March 25, 1947.

For the petitioner, *Vincent J. Casale.*

For the respondent, *Riker, Marsh & Scheerer* (by *Theodore McC. Marsh* and *Harry Schaffer*).

KREAMER, COMMISSIONER. These are appeals by the City of Newark from judgments of the Essex County Board of Taxation granting reductions on land and building for the years 1943, 1944 and 1945. The subject property is located at 736-752 Broad Street and is more specifically designated

as Block 145, Lot 1. Erected thereon is a thirty-six story store and office building. The property lies on the east side of Broad Street between Clinton and Commerce Streets. The frontage on Broad Street consists of 187.55 feet. It has side line depths along Clinton Street of 191.50 feet and along Commerce Street of 189.13 feet. The rear line is 176.52 feet.

The city by these appeals seeks the restoration of the original assessment for land and building. In each of the cases the assessment was the same. The County Board judgments granting reductions were the same for 1943 and 1944. The judgment for 1945 differed slightly. The figures are as follows:

|  | Assessment | 1943-1944 County Board | 1945 County Board |
|---|---|---|---|
| Land ............ | $1,751,300 | $1,315,000 | $1,315,000 |
| Improvements ..... | 4,200,000 | 3,700,000 | 4,000,000 |
|  | $5,951,300 | $5,015,000 | $5,315,000 |

The respondent accepted the reductions granted by the County Board and filed no appeals for further reductions except in the 1945 case and this appeal was withdrawn by respondent at the hearing.

In each of the appeals John A. Linnett and Morris Goldfarb appeared for the city and Franklin Hannoch and George Goldstein for the respondent, all witnesses testifying as to valuation.

The experts maintained their respective valuations on the land, exclusive of improvement, for each of the years 1943, 1944 and 1945, thus indicating no change in value thereon. Consequently their testimony with respect to land valuation and the final determination of value by this body as to land may be applied to all three cases.

Mr. Goldfarb and Mr. Linnett, for the city, testified to a value of $1,525,000 and $1,561,000, respectively, for the

land, where as Mr. Hannoch and Mr. Goldstein, for the respondent, testified to a value of $1,315,000. The difference between the estimates on behalf of the city and the respondent resulted mainly from the application of a $6,000 per unit foot value by the city and a $5,000 per unit foot basis by the respondent with respect to the Broad Street frontage.

There was introduced into evidence in the 1943 case a certified copy of a judgment of the New Jersey Supreme Court in connection with the 1942 appeal of the taxpayer. This judgment was rendered April 11th, 1945, in the matter of *Newark and Essex Building Corp.* v. *The City of Newark et al.,* and recited that on January 4th, 1944, the State Board of Tax Appeals entered a judgment reducing the assessment, allocating $1,560,500 to land and $4,200,000 to building. The Supreme Court modified the determination of the State Board of Tax Appeals and entered a judgment which allocated $1,527,000 to land and $3,200,000 to building. See *Newark and Essex Building Corp.* v. *City of Newark et al.,* 132 *N. J. L.* 574; 41 *Atl. Rep.* (2d) 894.

Both Mr. Goldstein and Mr. Hannoch testified in the *certiorari* proceedings before the Supreme Court in the 1942 case. The reported opinion of that tribunal, which may be found at the foregoing citation, reveals that the court based the decision on the testimony of Mr. Hannoch, stating: "All the facts considered, we can only conclude that the assessment should be reduced to comply with the views expressed by Mr. Hannoch."

Mr. Hannoch's present estimate of land value, however, differs from the valuation given by him in 1942 case. In that case Mr. Hannoch testified to a valuation of $1,527,000 for the land whereas his estimate in the 1943 case is $1,315,000, a decline of over $200,000 in the opinion of this witness. The principal reason for this was that in the 1942 case Mr. Hannoch ascribed $6,000 as the unit foot valuation for the Broad Street frontage, whereas in the appeals now pending he ascribes a valuation of $5,000 per unit foot for

the same frontage. This despite the fact that both **Mr.** Hannoch and Mr. Goldstein have testified that no physical or economic change in the subject property took place between the assessing date for 1942 and the assessing date for 1943 such as would justify any change in valuation.

What may be accomplished by a manipulation of figures has already been commented upon by the courts. *Haworth* v. *State Board,* 127 *N. J. L.* 67; 21 *Atl. Rep.* (*2d*) 309; *City of Plainfield* v. *State Board,* 19 *N. J. Mis. R.* 313; 19 *Atl. Rep.* (*2d*) 195. We shall proceed first to examine the testimony of the experts for the respondent and ascertain whether there is anything to be found therein to justify the change in the basis of their valuation of the land for these two years.

The factors which, according to the witness Hannoch prompted him to change his land valuation from $6,000 per unit foot on Broad Street in 1942 to $5,000 in 1943, may be summarized as follows:

(1) That the $6,000 unit figure used in the 1942 case was "more or less arbitrarily set;" that since the time of his previous testimony this Division had rendered a judgment with respect to other property in a different block on Broad Street at $5,000 per unit foot. The witness further stated that in coming to his conclusion he had sought to make his present valuation uniform with the base set in that decision;

(2) that the market value of the land had declined to $5,000 per unit foot "by reason of the improvement that's on it;"

(3) that where a building thirty-six stories in height improves a plot of land of this size there is a much greater ratio as between building and land value than a ratio of two to one; and

(4) that there was a sale of comparable property which indicated a $5,000 per unit foot valuation.

With reference to the first factor it is interesting to note that in his testimony before this Division and before the Supreme Court in the 1942 case this witness made no state-

ment that his $6,000 unit foot valuation was "arbitrarily set." , In his deposition before the Supreme Court the witness stated that his estimate of the land value was "based on my physical estimate of the land value of $6,000 per front foot for 189. feet of frontage on Broad Street." As to the judgment which purportedly entered into his calculations, the witness admitted on cross examination that he had arrived at his present opinion of value before the rendering of the determination and, therefore, it could not have influenced him. Mr. Hannoch admitted that as of the assessing date a hypothetical buyer could not divine what this Division's judgment was going to be.

As to the second factor we are at a loss to understand the process of reasoning which caused the witness to conclude that the market value of the property had declined from $6,000 to $5,000 per unit foot by reason of the "improvement that's on it." The same improvement in the same economic and physical condition as of the assessing date for 1943 existed as of the assessing date for 1942. In both years the witness' front foot valuation on Broad Street was to a depth -of 100 feet. In both years the witness gave the same valuations for the Commerce Street and Clinton Street frontages. The effect of the testimony of this witness, therefore, is that the Broad Street frontage for a depth of 100 feet declined in valuation while the rear 90 feet frontages on Clinton and Commerce Streets, respectively, remained constant. This despite the fact that the entire area is one parcel used for one purpose and has not changed in size or economic circumstance during the year. In this connection it is interesting to contrast the testimony of Mr. Hannoch to that of his colleague, Mr. Goldstein. As indicated, this witness also testified in the 1942 case and ascribed . a unit valuation on Broad Street of $6,000 to a depth of 100 feet and changed to his present unit valuation of $5,000 in 1943. He, however, increases his valuation for the side street frontages over his 1942 figure and asks this body to believe that the rear portion of the plot actually increased in value while

the Broad Street frontage decreased in value. The postulation of either witness would be incredible if standing alone, but is absurd when compared each with the other.

Nor are we impressed with Mr. Hannoch's theory of proportion of much greater than two to one of building value over land, since it does not apply with equal force to his 1942 valuation. In the former year his building valuation exceeded the ratio of two to one over the land valuation by a bare $146,000, whereas in 1943 the excess was more than $840,000.

The record with respect to the sale of comparable property reveals no factors which are of assistance in interpreting the alleged sale in terms of comparison to any reasonable degree of similarity with the property under review. *Colonial Life Insurance Company of America* v. *State Board of Tax Appeals,* 126 *N. J. L.* 197; 18 *Atl. Rep.* (*2d*) 559; *New York Bay Railroad Co.* v. *Kelly, State Tax Commissioner,* 22 *N. J. Mis. R.* 204; 37 *Atl. Rep.* (*2d*) 624. No satisfactory testimony was given as to the date of the sale, the surrounding circumstances, the identity of the buyers or sellers, the location or size of the property, or whether it was a sale of land only, or land and improvements.

It will not be necessary to review in detail the testimony of Mr. Goldstein since it is subject to many of the same criticisms enumerated herein with respect to the testimony of Mr. Hannoch. For the reasons stated, we are not impressed with the testimony of either of these witnesses who in a previous year "testified to an entirely different basis of valuation." *Public Service Electric and Gas Co.* v. *Township of Raritan, New Jersey Tax Reports* 1912-1934, *p.* 622. In the case of *Hoboken Land Improvement Co.* v. *City of Hoboken, New Jersey Tax Reports* 1934-1939, *p.* 150, it was said:

"As is usual in the testimony of experts, widely divergent views of values were presented on behalf of the parties litigant. It is well settled that testimony as to value, even that of experts does not differ in principle from evidence on other questions. The opinions are not conclusive and the Board

must consider all other facts in evidence and determine their weight and value by common sense and knowledge of the subject. * * * *State of New Jersey* v. *United New Jersey Railroad and Canal Co.,* 55 *N. J. L. J.* 129; 26 *Atl. Rep.* 135; *affirmed,* 11 *N. J. Mis. R.* 694; 167 *Atl. Rep.* 880.

"Little weight can be given to the testimony of some of the experts for respondent, as their conduct on the witness stand exhibited prejudice and partisanship, and they were evasive and reluctant to explain how they determined the sound values of the properties on the assessment dates. Furthermore, in appearing before the Board in other cases, some of these experts have testified to values contradictory to those previously placed on the same property, as of the same date. The Board therefore must evaluate the testimony of these witnesses with due regard to the impressions which they made while testifying."

See, also, *Aeolian Co.* v. *Borough of Garwood, New Jersey Tax Reports* 1912-1934, *p.* 611; *State of New Jersey* v. *United New Jersey Railroad and Canal Co.,* 71 *Atl. Rep.* 228; 55 *N. J. L. J.* 21; 26 *Atl. Rep.* 135; *affirmed,* 11 *N. J. Mis. R.* 694; 167 *Atl. Rep.* 880.

As to the building, all experts viewed the subject property as investment property and arrived at their opinions of value from the capitalization approach in all three cases.

We will first analyze the testimony in the 1943 case.

Income from the building is derived from three main sources, namely, the stores, the bank and the offices. The bank tenant, known as the National Newark and Essex Banking Co., occupies two floors of the property under lease from the respondent. Some attempt seems to have been made by appellant to throw doubt upon the validity of the rental paid by this tenant, but since both experts for the appellant considered the rental paid as fair and so treated it in their calculations, we must conclude that the lease was *bona fide.*

Mr. Linnett for the city took the actual gross income of $896,586.34, deducted operating expense and charges, and arrived at a net income figure. Mr. Linnett in his calcula-

tion used a risk rate factor of four per cent., and a depreciation factor of .909 and reached a value for the building in the sum of $4,195,900.

Mr. Goldfarb in his capitalization approach differed from his colleague, Mr. Linnett, although they both arrived at comparable results. Instead of using the actual gross income he stabilized the rental for stores and offices and thus arrived at an effective gross income of $1,000,721 after deductions for vacancies. This witness employed a risk rate of six per cent. and reached a capital value of $4,313,000 for the building.

Mr. Hannoch, for the respondent, used the same gross income figure of $896,586 as did Mr. Linnett, and after deducting operating and maintenance expenses there was left a net income also comparable to Mr. Linnett's. Mr. Hannoch applied a risk rate of five per cent. and a depreciation factor of two per cent. and arrived at a value for the building of $3,470,512.

Mr. Goldstein's testimony for the respondent was in all respects similar to that of his colleague except that he used a risk rate of six per cent. and arrived at a valuation for the building of $3,107,000.

There remains to be considered the effect of the judgment of the Supreme Court in the 1942 case, a certified copy of which was submitted in evidence by the respondent in the 1943 case now being considered. This judgment, as shown, reduced the assessment to $1,527,000 for the land and $3,200,000 for the building.

The record of this judgment could not have been, nor was it introduced under any theory that it conclusively determines the assessment for 1943. It was held in *United New Jersey Railroad, &c.,* v. *State Board,* 101 *N. J. L.* 303; 128 *Atl. Rep.* 427:

"Each annual assessment of property for taxation is a separate entity, distinct from the assessment of the previous or subsequent years."

Also, in *City of Hoboken* v. *Hoboken Land and Improvement Co., New Jersey Tax Reports* 1934-1939, *p.* 557, it was said:

"A judgment of valuation of real estate for taxation for one year is not *res adjudicata* as to an assessment for a following year. * * * The judgments for prior years may be considered but are not conclusive."

However, the introduction of the judgment was proper as part of the tax history of the subject property, and as such was a "circumstance to be considered in the resolution of the question of valuation." *Colonial Life Insurance Company of America* v. *State Board of Tax Appeals,* 126 *N. J. L.* 126; 18 *Atl. Rep.* (2d) 625.

It has been repeatedly held by this body and the higher tribunals that where the evidence adduced indicates no change in the condition of the property either physically or economically such as would justify an increase in valuation, judgments of prior years are most persuasive and will be followed. In *Carteret Academy* v. *City of Orange, New Jersey Tax Reports* 1912-1934, *p.* 364, a previous assessment against the same property had been sustained by the courts. The State Board held:

"No change had taken place * * * between the previous assessment and. that of October 1st, 1922, and there is no reason why the assessment of this last mentioned date should be disturbed."

In *Skouras Theatre Corp.* v. *State Board of Tax Appeals,* 123 *N. J. L.* 52; 8 *Atl. Rep.* (2d) 72, the assessment for the year 1936 was involved which had been increased above the 1935 figure. On *certiorari* the Supreme Court stated:

"There is nothing in the record to justify the increase in assessment. One of the witnesses, called for the city, said there was no increase in value between 1935 and 1936. No proof is needed, however, on the point.

"After a careful review of all the proofs, we are satisfied that the judgment of the State Board of Tax Appeals should be reversed, and it should enter judgment reducing the 1936

tax assessment to the same figure which it fixed in 1935; that is, land, $177,100, building, $60,000, total, $237,100."

In *Haworth* v. *State Board of Tax Appeals*, 127 *N. J. L.* 67; 21 *Atl. Rep.* (2d) 309, the Supreme Court in reviewing judgments of the State Board for the years 1938 and 1939, stated:

"A consideration of the tax history of this case (*Koch* v. *Jersey City*, 118 *N. J. L.* 85, 88; 191 *Atl. Rep.* 558; *affirmed*, 119 *N. J. L.* 432; 197 *Atl. Rep.* 275), clearly indicates the weakness of the borough's present appeal. From 1927 through 1936 the borough assessed these lands at $200,000. In 1937, the assessed value was fixed at $250,000 and this value was approved by this court in *Hackensack Water Co.* v. *State Board of Tax Appeals, supra* [122 *N. J. L.* 596; 7 *Atl. Rep.* (2d) 628]. Mr. Fricker testified to the effect that there has been no essential change in the condition of the land and that the trend of value of real estate, at the time of the assessments in question, was downward. Under such circumstance, the borough's argument for an increase in the assessed value of the land bears little weight."

In *Hackensack Water Co.* v. *State Board of Tax Appeals*, 129 *N. J. L.* 535; 30 *Atl. Rep.* (2d) 400, the Supreme Court again confirmed the same doctrine, holding:

"The tax history in this case, the absence of testimony to justify an increase, coupled with the quality of the testimony of Mr. Fricker, is persuasive, in our opinion, that the State Board of Tax Appeals erred in fixing the true value of the property on the assessing date."

See, also, *Camden County Realty Co.* v. *State Board*, 131 *N. J. L.* 132; 35 *Atl. Rep.* (2d) 221.

The record demonstrates to our satisfaction that there has been no physical or economic change in the land between the assessing dates for the years 1942 and 1943. As already indicated, both witnesses for the respondent testified to that effect, and counsel have assumed that position in their brief. The petitioner has not produced any satisfactory evidence to the contrary.

We are convinced, therefore, that under the circumstances of this case we are bound to follow the judgment of the Supreme Court in the 1942 case in arriving at our determination of the value of the land in the 1943 appeal now under consideration.

Counsel for the respondent, although acknowledging that the judgment of the previous year should be followed, yet argues that the figure presently placed upon the land by respondent's experts should be adhered to. This contention is based upon the theory that the judgment of the Supreme Court fixing the assessment for the year 1942 is not separable as to land and building but is effective only in its totality. From this premise it is urged that since the total figure of the 1943 judgment of the County Board with which the respondent was satisfied and from which it did not appeal exceeds the total figure of the 1942 Supreme Court judgment, the County Board judgment should not be disturbed either as to land or building. The same process of reasoning is made to justify Mr. Hannoch's changed 1943 valuation, which while lower in 1943 as to the land, yet in its totality compares with the 1942 valuation. The argument, if sound, would prevent this body from separately increasing the assessment figure placed upon the land by the County Board to conform with the 1942 judgment on the land.

It is incumbent upon us to examine into the respondent's theory of total valuation and determine whether it has any basis in law.

The following are the sections of our Tax Act applicable to the problem:

"54:4-23:—The assessor shall ascertain the names of the owners of all real property situate in his taxing district, and, after examination and inquiry, determine the full and fair value of each parcel of real property situate in the taxing district at such price as, in his judgment, it would sell for at a fair and *bona fide* sale by private contract on October first next preceding the date on which the assessor shall complete his assessments, as hereinafter required.

"54:4–24:—The assessor shall make a list in tabular form of the names of the owners, and set down in proper columns opposite each name the description and area of each parcel sufficient to ascertain its location and extent and the value of each parcel as determined by him. Property held in trust shall be assessed in the name of one or more of the trustees as such, separately from his individual assessment. If the name of the owner of a parcel shall be unknown, it shall be so entered in the list of names, and where an owner is not known to reside in the taxing district the list shall describe him as nonresident."

"54:4–26:—In listing the names of owners and properties the assessor shall follow such forms and methods as may be prescribed by the state tax commissioner, who may by rule direct the assessor in a taxing district to determine the true value of each parcel of real estate assessed by him without the building and improvements and to note the same on the list, and to determine and note separately the true value of every building and other structure on each parcel, and add and carry out the result as the assessed value of the parcel, and in such case the receipt given for the payment of the tax shall contain the separate valuations. The commissioner may by rule direct the assessor in a taxing district to enter on his list separately the number of acres of arable land, of meadow pasture land, of woodland, and of uncultivated upland and swamp land in each parcel as near as can be."

Particular notice is commanded by the directive in *R. S.* 54:4–26; *N. J. S. A.* 54:4–26, to the assessors of a taxing district, under an existing rule of the State Tax Commissioner, to list separately the value of the parcel without the improvement, and the value of the improvement, and *"then to add and carry out the result as the assessed value of the parcel."* (Italics supplied.)

All of the foregoing sections were at one time included in the same section known as section 401 of article 4 of the General Tax Act and, of course, are in *pari materia* and must be read together. They were first construed by the Supreme Court in *City of Newark* v. *Timer,* 12 *N. J. Mis.*

*R.* 125; 170 *Atl. Rep.* 37. In that case the taxpayer appealed to the County Board from the valuation of the building only, and obtained a reduction. The city appealed to the State Board and sought the restoration of the assessment on the building. At the hearing before the State Board the city attempted to introduce testimony as to the true value of the premises as a whole. This was objected to on the ground that the only issue was the value of the building. The State Board sustained the objection, affirmed the action of the County Board, and dismissed the appeal. The Supreme Court on *certiorari* affirmed the judgment of dismissal, stating:

"Article 4, section 7, paragraph 12, of our State Constitution, provides that 'property shall be assessed for taxes under general laws, and by uniform rules, according to its true value.'

"Section 202 * * * of the General Tax Act * * * provides: 'All property * * * shall be subject to taxation annually * * * at its true value * * * and shall be valued by the assessor * * *.'

Section 401 of article 4 of the General Tax Act as amended *Pamph. L.* 1927, *p.* 576; *Comp. Stat. Supp.,* § 208–66d (401) [*N. J. S. A.* 54:4–23; 54:4–24; 54:4–26], provides: 'The assessor shall * * * determine the full and fair value of each parcel * * * and said assessor shall make a list. * * * In listing the names of owners and properties the assessors shall follow such forms and methods * * * prescribed by the State Board * * * said board may by rule direct the assessor to determine the true value of each parcel of real estate * * * without the buildings and improvements and to note the same on the list, and to determine and note separately the true value of every building and other structure on each parcel, and add * * * the same as the assessed vaule of the parcel. * * *'

"The State Board did by rule direct the division * * * and, pursuant to such direction, the city of Newark did (note values separately). * * * One of the objects sought * * * by the statute and * * * rule was to make it

more readily appear that there had been a compliance with the constitutional requirement of taxation 'by uniform rules. * * *'

"But it is quite apparent that at least one object of the statute and rule was to clarify and simplify appeals before the county and state boards. If, as in the instant case, the property owner is satisfied with the asesssment against his land, but feels that the assessments against the improvements thereon is too high, he is not compelled to appeal from the assessment against the land, but does appeal from the assessment upon the improvement. In this way the issues before the appellate body are much confined.

"In the present instance * * * the sole question was the propriety of the assessment on the improvements. * * *

"As was stated by the State Board * * * the board's jurisdiction was limited to the issue presented by the petition of appeal, and the proof was necessarily confined to that issue. * * *

"Since, then, the sole question * * * was the true value of the improvement, it was not erroneous to exclude testimony as to the value of the land and building in one lump sum. * * *"

The case of *Koch* v. *Jersey City,* 118 *N. J. L.* 85; 191 *Atl. Rep.* 558; *affirmed,* 119 *N. J. L.* 432; 197 *Atl. Rep.* 275, was a decision by our Supreme Court construing the Timer case. Here the taxpayer appealed to the State Board on land and building. At the hearing the taxpayer called an expert who placed a value on land only. This was objected to on the ground that any valuation should be in "a lump sum for the whole." The taxpayer claimed the right to produce evidence separately as to land and then as to the improvement or *vice versa.* The State Board excluded any separation of items and dismissed the appeal. The Supreme Court reversed the State Board on *certiorari,* stating:

"*The plain implication of the decision* (Newark v. Timer) *is that appeals may be taken separately on land and buildings and each of the two items considered on its merits.* (Italics supplied.) In fact, this was done in the present cases, and

as we understand the matter, on the printed forms supplied by the board, which append footnotes in fine print, giving instructions about filling blanks, &c. Continuing with lot 22 E as a sample case, we find the petition states, following the form, the city valuation to be, land $4,700; improvements $4,100, personal, blank, total, $8,800; and asks that it be reduced to land $3,250, improvement $2,500, personal, blank, total $5,750. The records in the other cases are the same in form, with different amounts. They show, therefore, in each case (except a vacant lot), an appeal on land valuation, and an appeal on improvement valuation, either or both affecting the resultant total. If appellants are allowed, as we think they should be, and as the Timer case intimates, to appeal land and building valuations separately on the record, they must be allowed to prove their challenges separately. It may be that where both are challenged in one appeal testimony as to total value is permissible. This seems to be assumed in the Timer case, but the point is not now before us and we do not pass on it. We hold, however, that it was error to exclude the testimony as to separate land valuation, and for this the judgment of the State Board must be set aside and the cases remanded for further hearing in consonance with these views."

A very recent pronouncement on the subject to the same effect may be found in *Griffith* v. *Newark,* 125 *N. J. L.* 57; 13 *Atl. Rep.* (*2d*) 860. In this case the taxpayer appealed on land and building and the assessments were affirmed by the County Board. The State Board reduced the valuation on land and building, but the taxpayer sought further reductions on *certiorari*. The taxpayer produced witnesses who testified to the value of the land and other witnesses as to the building. Taxpayer's witnesses also testified separately as to the entire value of land and building together. The latter valuation was lower than the figure obtained by adding the land and building valuations and it was this figure that the taxpayer contended should be adopted. The court said:

"While admitting that evidence of the separate values of land and building is proper, prosecutor argues that standing

alone this should be given no probative force as opposed to testimony of the entire value of the property in its then condition as a business venture. However, the method of arriving at a valuation by separate assessments of land and building has long been approved. *Koch* v. *Jersey City,* 118 *N. J. L.* 85; 191 *Atl. Rep.* 558; *affirmed,* 119 *N. J. L.* 432; 197 *Atl. Rep.* 275. The statute requires the valuation to be apportioned between land and improvements."

It is difficult to conceive what comfort respondent may receive from an analysis of *Colonial Life Insurance Company of America* v. *Jersey City,* 18 *N. J. Mis. R.* 60; 11 *Atl. Rep.* (2*d*) 14, a case. relied upon by it. Whatever was said concerning the summation of separate valuations for land and building was qualified by the reference to the "superior authority" of the Koch case. In any event, the board was directing its remarks to the probative value of proof and can in nowise be considered as authority on the question of separability of an assessment finally arrived at by a court of law.

It is at once apparent from the principle enunciated in the Timer, Koch and Griffith decisions that: (1) separate appeals may be taken on land or building and (2) where appeals on land and building are taken by a single petition, the assessments may be challenged separately and values proven separately. The respondent's contention, therefore, that the 1942 judgment is not separable as to land and building, is not well taken. For to say on the one hand that separate appeals and separate challenges of land and building valuations are proper, and on the other hand to deny the separability of valuations when finally determined, is to arrive at discordant conclusions. We conceive that the respondent is bound to the figure of valuation set by the 1942 judgment as to the land. As to the building, the figure determined upon by the County Board, although higher than the 1942 judgment, cannot be disturbed since no appeal is pending by the taxpayer which can accomplish this result. All that is before us is the appeal by the city to restore the separate assessments on land and building.

In the 1944 and 1945 cases a stipulation was entered into between counsel that so much of the testimony that pertained to the witnesses' methods of valuation, questions on cross-examination and answers to such questions, objections made by counsel for both parties and the rulings of the panel would apply to the record of the testimony of the witnesses in these cases, without being repeated in full. Excepted from the stipulation was the valuation arrived at by each witness and the figures used for that valuation. Also excepted from the stipulation was the exhibit submitted in the 1943 appeal, this exhibit being the certified copy of the 1942 Supreme Court judgment.

In the 1944 case Mr. Linnett again took the actual gross income which for this year amounted to $947,932.65, from which he deducted operating expense and charges. By the use of the same risk rate factor of four per cent. that was used in 1943, and a depreciation factor of .954, this witness' valuation for the building was capitalized at $4,466,900.

Mr. Goldfarb, as he did in the 1943 appeal, stabilized the income in the 1944 and arrived at an effective gross income of $1,086,412. Using the same risk rate of six per cent. as he previously had, he reached a reflected value of $4,848,000 on the building.

Mr. Hannoch, in his capitalization approach in the 1944 case considered the same income as did Mr. Linnett, namely, $947,932. Deducting expenses and charges gave him a net income in substantially the same amount that Mr. Linnett considered. Mr. Hannoch took the same risk rate of five per cent. as in the 1943 case, and a depreciation rate of two per cent. and arrived at a value for the building as of October 1st, 1943, in the sum of $3,788,170.

As in the 1943 case Mr. Goldstein's testimony was in all substantial respects similar to Mr. Hannoch's, except that he used a risk rate of six per cent. and arrived at a value for the building of $3,404,500.

In the 1945 case Mr. Linnett took the actual gross income of $1,011,762.41 and after deducting expenses and charges

and arriving at a net income figure, he then took all the other factors into consideration including a risk rate of four per cent. as he did in the prior years, and arrived at a valuation for the building in the sum of $5,236,170.53, which he rounded out to the figure of $5,236,200.

Mr. Goldfarb, as he did in the 1943 and 1944 appeals, stabilized the income and arrived at an effective gross income for the entire property in the sum of $1,172,104. Using the same method of calculation as in prior years and the same type of risk rate of six per cent. this witness' capitalized value for the building was $5,512,000.

For 1945 Mr. Hannoch considered the same income as did Mr. Linnett, namely $1,011,762. For this year, in his capitalization approach, this witness took a risk rate of six per cent. for land and building instead of the five per cent. rate that he had used in the 1943 and 1944 cases. By reason of the procedure followed by him, the witness arrived at a value of the building as of October 1st, 1944, in the sum of $4,000,000.

Mr. Goldstein also took the gross income of $1,011,762 and his testimony was in all respects similar to that of his colleague, Mr. Hannoch, in the 1945 case. He set the value of the building at $4,014,700, a figure comparable to the value set by Mr. Hannoch.

It should be observed that Mr. Hannoch and Mr. Goldstein for the respondent and Mr. Linnett for the petitioner testified to the same gross income figures for the three years under appeal, i. e., $896,586 for 1943, $947,932 for 1944, and $1,011,762 for 1945. It should also be observed that each witness increased his valuation on the building in 1944 above his 1943 valuation in comparable amounts. Mr. Linnett testified to an increase of $271,000, Mr. Goldstein $297,000, and Mr. Hannoch $318,000.

In 1945 Mr. Linnett and Mr. Goldstein more or less agreed as to the amount of increase in value on the building above their 1944 valuations, Mr. Linnett testifying to an increase of $770,000 and Mr. Goldstein to an increase of $610,000.

Mr. Hannoch however, falls far below the level of increase of any of the witnesses. His increase over his 1944 building valuation amounted to only $212,000. The principal reason for this, the statistics reveal, is that in 1943 and 1944 Mr. Hannoch used a risk rate of five per cent. whereas in 1945 he used a risk rate of six per cent. Thus he arrived at a disproportionately lower figure of increase than that of the other experts who used the same risk rate for all three years.

Mr. Hannoch ascribes the following reasons for the increase in risk rate in the 1945 case:

(1) that as of October 1st, 1944, the building had become fully occupied and there was not the opportunity for renting at increased rentals and therefore the gross income had become constant;

(2) that in October, 1944, we were in a highly speculative real estate market where the risk involved in the purchase of property was greater than it was in the preceding year;

(3) that with regard to office space throughout the city, conditions were better with regard to occupancy as of October 1st, 1944, than they were as of the two prior years; that the amount paid for office rent per square foot was higher than in prior years; and

(4) that the sale of the Griffith Building at No. 605 Broad Street on October 17th, 1944, and the Globe Building at No. 20 Washington Place on September 18th, 1945, indicated a return of nine per cent. Both buildings were a number of blocks north of the subject property.

We are not persuaded by any of the foregoing factors. The fact that the building was fully occupied as of the assessing date would not in our opinion have the effect of increasing the risk rate. The complete occupancy of the building and the improved economic condition would, to our mind, have the effect of decreasing the risk that would be encountered rather than increasing it. As to the assertion that the income had become constant by reason of complete occupancy, Mr. Hannoch admitted that he had made no analysis of the leases and therefore did not know (a) what proportion of the build-

ing was leased, (b) the status of the leases in existence or (c) whether the rental was "going to be frozen for three years, or maybe only three months or maybe one month." Mr. Hannoch further admitted that he did not have any of this information at the time he arrived at his opinion of value.

Also, there was no proof that the alleged speculative market asserted to have only begun in October, 1944, would adversely affect the stability of investment in the subject property.

As to the sales of the other properties we do not consider either of them as at all comparable. Thus the particular sales referred to cannot be used as guide posts in setting the risk rate. The improvement under appeal is the most modern office building of its kind in Newark and constructed strictly for income purposes. It has been judicially determined that the Griffith building was constructed by the owner "as sort of monument to himself" where the "income is assuredly not the sole test of value," *Griffith* v. *City of Newark,* 125 *N. J. L.* 57; 13 *Atl. Rep.* (2d) 860. Additionally, no factors were given by the witness nor, from our own personal inspection, could have been given, as to either sale which would indicate the comparability of the improvement involved therein with that of the subject property.

We are thus driven to the conclusion that there was no justification for an increase in the risk rate for 1945 as testified to by Mr. Hannoch. All the other experts employed a constant factor. We hesitate to say that Mr. Hannoch's failure to do likewise was grounded in a desire to influence his result. Yet we feel that, together with the unjustified change in the basis of his land valuation already commented upon it is illustrative of the general unreliability of this witness' testimony. See *Public Service Electric and Gas Co.* v. *Township of Raritan, supra; Hoboken Land Improvement Co.* v. *City of Hoboken, supra.*

In view of all of the foregoing and upon an actual inspection of the subject property, we have arrived at the following determination:

## *1943*

The judgment of the Essex County Board of Taxation is modified as to the land, and the assessment restored to the extent of $1,525,000; as to the improvement, the petition of the city is dismissed and the judgment below reducing the valuation to $3,700,000 is accordingly affirmed.

## *1944 and 1945*

The judgments of the Essex County Board of Taxation are modified as to land and improvement, and the assessments restored to the extent reflected in the following figures:

<div align="center">

*1944*

| | |
|---|---|
| Land ............... | $1,525,000 |
| Improvement ......... | 3,800,000 |
| | $5,325,000 |

*1945*

| | |
|---|---|
| Land ............... | $1,525,000 |
| Improvement ......... | 4,200,000 |
| | $5,725,000 |